IN THE UNTIED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MAURICE CRUZ-WEBSTER,                   :
                                        :
                    Petitioner,         :
                                        :
        v.                              :        Civil Action No. 21-1679-CFC
                                        :
BRIAN EMIG, Warden, and                 :
ATTORNEY GENERAL OF THE                 :
STATE OF DELAWARE,                      :
                                        :
                    Respondents.[1]     :

————————————————————

Maurice Cruz-Webster. *Pro se* Petitioner.

Elizabeth Roberts McFarlan, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware.  Attorney for Respondents.

————————————————————

**<u>MEMORANDUM OPINION</u>**

December 18, 2024
Wilmington, Delaware

————————————————————

[1]The Court has substituted Warden Brian Emig for former Warden Robert May, an original party to the case.  *See* Fed. R. Civ. P. 25(d).

CONNOLLY, CHIEF JUDGE:

Petitioner Maurice Cruz-Webster filed a Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 and a Supplement to Memorandum of Law (collectively referred to as "Petition"). (D.I. 1; D.I. 6) The State filed an Answer in opposition, to which Petitioner filed a Reply. (D.I. 10; D.I. 15) For the reasons discussed below, the Court will deny the Petition.

## I.    BACKGROUND

### A. Factual History

On January 9, 2015, Kyrell Lewis, who was also known as "Bubba," was shot to death in front of his house in New Castle, Delaware. […]

At 6:37 p.m. on January 9, 2015, Lewis received a text message stating "Yo, I'm out here." The message was purportedly sent to Lewis by [Petitioner]. The text was the final text message in a string of texts that started earlier that night. The gist of the messages was a demand that Lewis stop "playing" him over an alleged unpaid debt.

Also at that time, Lewis met with an individual outside of his house where an argument ensued. The testimony varied about the number of individuals present during the argument. The argument became heated, and neighbors overheard and watched as the argument escalated. An individual, alleged to be [Petitioner], was angry and yelling at Lewis until the argument subsided. As the individual started to walk away, Lewis said something which apparently infuriated that individual, causing him to run up to Lewis and fire four shots at him, and three more shots as he ran away.

Lewis was struck by the gunshots and stumbled inside of his residence and directed his aunt, Phyllis Shaw, to call the police. Lewis spoke to the 911 dispatcher and stated he did

not know who shot him. Shortly thereafter, Lewis told Patrolman Barnes that it was two black men in all black clothing who shot him. He then told Patrolman Townsend that he was shot by an unknown individual. Finally, he told EMT Brian Reeder that he just heard four pops.

Shaw resided near the crime scene and was present at 6:37 p.m. She was in her front bedroom when she heard Lewis walk out of the house. She heard Lewis arguing with another person and looked out the window. She stated that Lewis was arguing with [Petitioner], whose nickname was "Mere." [Petitioner] was wearing a purple zip-up hoodie and a gray pair of sweatpants. His head was covered by the hood.

Shaw walked away from the window but the arguing continued. She briefly looked out the window again and observed the argument continue. She walked away from the window briefly and heard gunshots. She went downstairs and observed Lewis come inside and state that he had been shot. She called 911 at 6:48 p.m. Shaw did not see the shooting or ever see [Petitioner] with a gun.

Shaw took possession of Lewis's cell phone and brought it to the hospital where it was provided to the police. Detective Jamante Cooper extracted information from the phone, including the call log, text messages, and contact information. The same phone number from which Lewis received the text message was listed in his phone as "Mersey." The following exchange took place between Mersey and Lewis. At 6:27 p.m., Mersey texted Lewis, "When you fucking make nigga stop playing with me FR [for real]." At 6:28 p.m. Lewis responded, "You playing with you, not me. HMP [Hit me up]." Thirty seconds later, a text from Mersey stated, "What?" "WYA?" Lewis responded "Crib." A text from Mersey stated, "ART [All right]. I'm about there. Come out." At 6:37 p.m., a text from Mersey stated, "Yo, I'm out here."

3

Joe Trawicki, a representative from Sprint, and Brian Dailey said that [Petitioner] is the subscriber for the cell phone number that was texting Lewis. Dailey also conducted cell tower analysis for that cell phone number. Dailey concluded that calls made from that phone placed it in the general area at the time of the shooting, but that a precise location was unable to be established because of the limitations of cell tower analysis.

Nora Luevano and Jorge Lujan were present at a nearby house at the time of the shooting. They had gone out for dinner and when they arrived home they observed Lewis arguing with another man in Lewis's driveway. There is one townhouse in between their location and the crime scene. They went into the house to watch TV. When the argument continued, Luevano decided to go upstairs to the spare bedroom to see what was going on. She saw her neighbor and the other man arguing. The other individual was wearing white pants. A third man walked up and kind of stood behind them. She saw that the man who was arguing with Lewis said something. This caused the man he was arguing with to turn around, run back at him, and fire gunshots at Lewis from about three and one half feet away. He then fired more shots as he was running away.

Luevano was certain that the man who shot Lewis was the same person who was arguing with him in the driveway. Luevano testified that the lighting conditions were not good enough to see the shooter's face. She said the shooter was wearing white pants, not sweatpants. He was wearing a light jacket, but no hood on his head. She was not able to identify [Petitioner] as the shooter.

Jorge Lujan heard the argument but did not see the shooting. He was not able to identify [Petitioner] as the individual who was arguing with Lewis.

4

Douglas Pressley was at a nearby residence, sitting on his car talking to a friend on his cell phone, when the shooting occurred. He heard arguing about a sporting event prior to the shooting but did not observe the actual shooting. One of the bullets pierced Pressley's pant, but did not cause injury.

Pressley was unable to identify [Petitioner] as one of the individuals at the victim's house at the time of the argument or shooting. He also testified that he observed four or five people present at the scene during the argument with Lewis. Pressley told Officer Zolonowski that he saw Lewis arguing with a group of black males and a white male with a red beard and red clothing. Pressley first told Detective Sendek that he saw four or five males at the scene, but later said it was five or six males.

Fawwaz Mohammed is a clerk and manager at Newcastle Market, a local convenience store. The police took a surveillance video from him which purportedly shows [Petitioner] in the store buying minutes for his phone on the date of the offense. The video purportedly showed [Petitioner] with pants matching Luevano's description of the shooter. The time on the receipt for the minutes purchased did not correspond to the time on the videos. Mohammed stated that the dates and times on the video were not accurate or reliable.

No gun was recovered. DNA was recovered from the shells located at the scene, but no fingerprints were lifted from the shells. Paul Gilbert of the Division of Forensic Science performed a DNA analysis of the swabs from the shells. His analysis disclosed that the swabs from the shell casings were consistent with being a mixture of at least two individuals, at least one of which was a male. The DNA of the major and minor contributors were not consistent with the known DNA profile of [Petitioner].

[Petitioner] was arrested the next day and was taken to Howard R. Young Correctional Institut[ion] where he was

> incarcerated in a pretrial intake pod, Pod 1–A. On January 20,
> 2015, Donald Cooper, a convicted felon, was arrested for a
> violation of probation and was placed in the same pod with
> [Petitioner]. They were on the same pod for about 14 days.
> Cooper claimed that [Petitioner] told him: "Bub owed
> [Petitioner] $80 for some weed and he had to do it. He wasn't
> going to fight Bub, he said—and he was scared to fight Bub,
> something like that. And he said that he hit [Bub] with a 'nine'
> [a 9 mm handgun]. He said the 'nine' was still out there." In
> February 2015, Cooper spoke to Detective Ziemba and
> provided him with the information about what [Petitioner] had
> told him.

*Cruz-Webster v. State*, 155 A.3d 833 (Table), 2017 WL 464536, at *2-3 (Del. Feb. 2, 2017).

### B. Procedural Background

On April 15, 2015, a New Castle County grand jury indicted Petitioner on charges of first degree murder, first degree reckless endangering, and two counts of possession of a firearm during the commission of a felony ("PFDCF"). (D.I. 9-1 at Entry No. 5)  In January 2106, a Delaware Superior Court jury found Petitioner guilty of all charges. *See Cruz-Webster*, 2017 WL 464536, at *1. On March 11, 2016, the Superior Court sentenced Petitioner to life imprisonment at Level V incarceration for his first degree murder conviction, plus an additional 15 years of incarceration for the remaining convictions. *See id.*; (D.I. 9-1 at Entry No. 53)  The Delaware Supreme Court affirmed Petitioner's convictions and sentences on direct appeal. *See Cruz-Webster*, 2017 WL 464536, at *5.

In June 2017, Petitioner filed a *pro se* motion for postconviction relief pursuant to Delaware Superior Court Criminal Rule 61 motion ("Rule 61 motion"), and a motion for

6

appointment of counsel. (D.I. 9-1 at Entry Nos. 72, 73; D.I. 9-16)  The Superior Court granted the motion to appoint counsel and, in October 2018, appointed post-conviction counsel filed an amended Rule 61 motion. (D.I. 9-1 at Entry No. 99; D.I. 9-20 at 114-186)  On August 31, 2020, the Superior Court denied Petitioner's amended Rule 61. *See State v. Cruz-Webster*, 2020 WL 5117967, at *10 (Del. Super. Ct. Aug. 31, 2020). The Delaware Supreme Court affirmed that decision on April 22, 2021.  *See Cruz-Webster v. State*, 251 A.3d 643 (Table), 2021 WL 1575180 (Del. Apr. 22, 2021).

## II.    GOVERNING LEGAL PRINCIPLES

### A.  The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003).  Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Additionally, AEDPA imposes procedural requirements and standards for analyzing the merits of a habeas petition in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

### B.  Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the petitioner has exhausted all means of available relief under state law.  *See*

28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). AEDPA states, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). This exhaustion requirement, based on principles of comity, gives "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 844-45; *see Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).

A petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits. *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples,* 489 U.S. 346, 351 (1989). If the petitioner raised the issue on direct appeal in the correct procedural manner, the claim is exhausted and the petitioner does not need to raise the same issue again in a state post-conviction proceeding. *See Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir. 1997).

If a petitioner presents unexhausted habeas claims to a federal court, and further state court review of those claims is barred due to state procedural rules, the federal court will excuse the failure to exhaust and treat the claims as exhausted. *See*

8

*Coleman v. Thompson*, 501 U.S. 722, 732, 750-51 (1991) (such claims "meet[] the technical requirements for exhaustion" because state remedies are no longer available); *see also Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006). Such claims, however, are procedurally defaulted. *See Coleman*, 501 U.S. at 749; *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000). Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman*, 501 U.S. at 750*; Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999); *Coleman,* 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

9

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent,"[2] then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623 (1998); *Murray*, 477 U.S. at 496. A petitioner establishes actual innocence by asserting "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

### C. Standard of Review

If a state's highest court adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d). Pursuant to § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial. 28 U.S.C. § 2254(d)(1) & (2); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir.

---

[2]*Murray*, 477 U.S. at 496.

2001). A claim has been "adjudicated on the merits" for the purposes of § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground. *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009). The deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). As explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

Finally, when reviewing a habeas claim, a federal court must presume that the state court's determinations of factual issues are correct. *See* § 2254(e)(1). This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary. *See* § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

### D. Ineffective Assistance of Counsel

In order to establish a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003); *United States v. Scripps*, 961 F.3d 626, 632 (3d Cir. 2020). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of

11

reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *Strickland*, 466 U.S. at 688. Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable." *Strickland*, 466 U.S. at 689. Under the second *Strickland* prong, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's error the result would have been different." *Id.* at 687-96. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* at 688. In order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987). A court may choose to address the prejudice prong before the deficient performance prong, and may reject an ineffectiveness claim solely on a petitioner's failure to satisfy one prong of the Strickland standard. *See Strickland*, 466 U.S. at 668.

## III.    DISCUSSION

Petitioner asserts the following 11 Claims in his timely-filed Petition: (1) the prosecution engaged in misconduct by eliciting an investigating officer's opinion that "he did not believe the victim was being totally truthful when he stated he did not know who shot him" (D.I. 6 at 1); (2) the prosecution engaged in misconduct by "impermissibly bolster[ing] Donald Cooper's testimony by eliciting a condition of his protection agreement that he testify truthfully" (D.I. 6 at 1); (3) "Cooper's pretrial video statement should have been excluded as cumulative, because it only served to bolster his in-court

12

testimony" (D.I. 6 at 2); (4) trial counsel provided ineffective assistance by failing to properly object to the State's prosecutorial vouching for the credibility of a key witness (Cooper) (D.I. 6 at 2); (5) trial counsel failed to request a mistrial following the inadmissible opinion testimony from a law enforcement officer on the veracity of the victim's dying statement, which was exculpatory to Petitioner (D.I. 6 at 2); (6) trial counsel failed to raise an objection under Delaware Rule of Evidence 901 with respect to the admission of store surveillance videos and receipts not properly authenticated (D.I. 6 at 2); (7) trial counsel failed to request the removal of a sitting juror on the basis of juror misconduct (D.I. 6 at 2); (8) trial counsel failed to object to the admission of Cooper's recorded statement to the police that was used to buttress his in-court testimony (D.I. 6 at 3); (9) trial counsel failed to investigate and call a defense witness who could have refuted the testimony of a key state witness (D.I. 6 at 3); (10) these cumulative errors deprived Petitioner of a constitutionally fair trial (D.I. 6 at 3); and (11) he is actually innocent (D.I. 1-1 at 6)

### A. Claim One: State Engaged in Prosecutorial Misconduct When Questioning Officer Barnes

The following excerpt from the Delaware Supreme Court's decision on direct appeal provides relevant background information for Claim One:

> At trial, the State called [Officer] Barnes as a witness. On direct examination, Barnes testified that he responded to Lewis's address for a "shots fired" call. He further testified that when he walked into the house the victim, Lewis, was conscious, alert, and speaking to him. Barnes stated that "I asked him what happened tonight, who shot you," and "I asked him several times, the question." Barnes testified that Lewis's response was that he was standing on the front steps

13

of his residence and two black males wearing all black shot him and ran towards Memorial Drive.

On cross-examination, defense counsel questioned Barnes with regards to asking Lewis multiple times what had happened. Defense counsel repeated Barnes's direct testimony by saying that he asked Lewis multiple times what happened and Lewis was consistent each time in responding that two black males wearing all black shot him. Barnes agreed that Lewis was consistent. Defense counsel also asked whether Lewis gave any other details, such as names, to which Barnes responded no. On redirect, the State asked "why did you ask him multiple times?" to which Barnes responded, "I didn't believe him, essentially. They didn't know—" Defense counsel objected immediately.

At sidebar, defense counsel stated his belief that the question was asked to invite the officer to comment on whether he believed Lewis, and asked the trial judge "*to strike the question and answer and instruct the jury to disregard it*." The prosecutor explained, "I did not ask that question to invite that response. I believe[d] that his response was going to be–to get more details because he did not give him details .... And that's important because I think the inference from that is that he wasn't being truthful." The trial judge stated, "I don't think the prosecution intended to elicit that response. Let me make that perfectly clear. The question is now what action should the court take to make sure the defendant does have a fair trial without inappropriate comments .... I'm going to give a curative ...." The Superior Court then provided a curative instruction, as follows:

> Ladies and gentlemen of the jury, I'm going to instruct you to disregard the police officer statement about his disbelief of what the Defendant[3] told him. Do you understand? What

---

[3]Although the trial judge misspoke when she said "defendant" rather than "Mr. Lewis," neither the State nor defense counsel noticed the error. (D.I. 9-4 at 18)   The trial judge

14

> the police officer thinks about the credibility of a
> witness is not relevant because you are the
> finders of fact in this case. You determine the
> credibility of the witness and evidence. That's
> your role. Do you understand?

*Cruz-Webster*, 2017 WL 464536, at *3-4 (emphasis in original).

In Claim One, Petitioner contends that his "due process right to a fair trial was violated by prosecutorial misconduct when the prosecutor elicited patrolman Barnes's opinion that he did not believe the victim was being totally truthful when he stated he did not know who shot him." (D.I. 6 at 1)  Petitioner raised this argument on direct appeal, and the Delaware Supreme Court denied it as meritless, explaining: "The Superior Court's finding that the prosecutor did not intend to elicit the testimony is entitled to deference on appeal and, therefore, is dispositive on the issue of alleged prosecutorial misconduct." *Cruz-Webster*, 2017 WL 464536, at *4.  Given these circumstances, Claim One will only warrant relief if the Delaware Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law.

In order for a prosecutorial misconduct claim to warrant federal habeas relief, the prosecutor's actions must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A prosecutorial misconduct claim must be examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on

---

brought her mistake to the attention of counsel before the next witness was called and asked whether Petitioner wished her to correct the error. (*Id.*)  Defense counsel stated, "No, I think they probably understood what you meant." (*Id.*)

the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993); *see also Greer v. Miller*, 483 U.S. 756, 765 (1987) (acknowledging that a prosecutor's improper question to a witness may "so infect the trial with unfairness as to make the resulting conviction a denial of due process."). In the Third Circuit, this inquiry involves examining "the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

Turning to the first prong of the § 2254(d)(1) inquiry, the Court notes that the Delaware Supreme Court did not specifically apply the *Donnelly/Darden* standard when holding that the State's questioning of Officer Barnes did not amount to prosecutorial misconduct warranting relief. Nevertheless, the Court concludes that the Delaware Supreme Court's decision was not contrary to Supreme Court precedent, because the state case cited therein[4] refers to *Donnelly* and articulates a standard consistent with the federal standard applicable to prosecutorial misconduct claims. *See Fahy v. Horn*, 516 F.3d 169, 196 (3d Cir. 2008) (Supreme Court of Pennsylvania's decision was not "contrary to" clearly established Federal law because it appropriately relied on its own state court cases, which articulated the proper standard derived from Supreme Court precedent); *Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying

---

[4]The Delaware Supreme Court cited to *Hughes v. State*, 437 A.2d 559 (Del. 1981). *See Cruz-Webster*, 2017 WL 464536, at *4. In *Hughes*, the Delaware Supreme Court held that a court must consider the following factors when determining whether prosecutorial misconduct "prejudicially affected the substantial rights of the accused": (1) the closeness of the case; (2) the centrality of the issue affected by the alleged error; and (3) the steps taken to mitigate the effects of the error. *Hughes*, 437 A.2d at 571.

16

the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause.").

The Court also concludes that the Delaware Supreme Court's decision did not involve an unreasonable application of the *Donnelly/Darden* standard. As an initial matter, given Petitioner's failure to provide clear and convincing evidence to the contrary, the Court defers to the Superior Court's factual finding that the State did not intend to elicit Officer Barnes's opinion testimony. Additionally, the Court independently finds that the record supports the Superior Court's factual finding. For instance, trial counsel's cross-examination highlighted the fact that Lewis consistently responded to Officer Barnes's multiple questions about "what happened" by describing the suspects as two males wearing all black, without providing any additional details. (D.I. 9-4 at 13-14) Because the cross-examination stressed the fact that Lewis provided no other details, the State properly anticipated that, on redirect, the officer would respond that he was attempting to learn additional details.

Based on this finding, the Court further concludes that the Delaware Supreme Court reasonably determined the facts by holding that the State's questioning of Officer Barnes did not amount to prosecutorial misconduct. The State did nothing improper when attempting to elicit testimony that Lewis provided no further details despite repeated questions, from which the State could argue that Lewis's description was not truthful. And, relatedly, the fact that the State was candid that it was attempting to elicit testimony from which it could argue an inference of non-truthfulness does not reveal

17

that the State was attempting to elicit the officer's belief that Lewis was not telling the truth.

Moreover, even if the State's questioning were improper, it did not have a "substantial and injurious effect or influence" on the jury's verdict. First, trial counsel objected to the first and only comment by Officer Barnes on Lewis's credibility. Second, this was not a close case, because: cell phone evidence directly linked Petitioner to the crime (D.I. 9-12 at 38-42, 67-78); video evidence corroborated Petitioner's attire and cell phone usage; Petitioner confessed his involvement to Cooper while held in pretrial custody (D.I. 9-12 at 44-48); and multiple witnesses testified about seeing or hearing the argument between Lewis and Petitioner. (D.I. 9-12 at 7-9, 14-21, 23-29, 31) Third, and perhaps most importantly, the trial court took steps to ensure that Petitioner received a fair trial by immediately informing the jury to disregard Barnes's opinion and by reminding them that it is was their duty to "determine the credibility of the witnesses and evidence." (D.I. 9-12 at 115)

Additionally, as the Delaware Supreme Court indicated, the trial judge was in the best position to assess the trial events and, within her discretion, she deemed a curative instruction to be the best remedy for Officer Barnes's sole comment on Petitioner's credibility. *See Cruz-Webster*, 2017 WL 464536, at *4 (finding that the "trial judge did not abuse her discretion or commit plain error by not *sua sponte* ordering a mistrial.") In turn, the Court must presume that the jury followed the trial court's instruction regarding what they should and should not consider. *See Greer*, 483 U.S. 756, 766 n. 8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible

18

evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions.").

Based on the foregoing, the Court concludes the Delaware Supreme Court did not unreasonably apply clearly established federal law in holding that the State's questioning of Officer Barnes did not result in substantial prejudice to Petitioner or deprive him of a fair trial. Accordingly, the Court will deny Claim One.

### B. Claim Two: State Engaged in Prosecutorial Misconduct by Vouching for Witness Cooper's Credibility

> Cooper, [Petitioner's] podmate, testified at trial that while awaiting trial, [Petitioner] told him he shot Lewis with a 9-millimeter handgun because Lewis owed him money for marijuana and he was scared to fight Lewis. [Petitioner] told Cooper that the gun was "still out there" and that someone deleted the text messages from Lewis'[s] phone before handing it over to the police so "it was like they were texting a ghost." Cooper provided this information to Detective Ziemba with hope that it would help his own case.

*Cruz-Webster*, 2020 WL 5117967, at *3. After providing this information to Detective Ziemba, Cooper entered into a Witness Services Protection Agreement with the State that required him to testify truthfully if called as a witness at Petitioner's trial. (D.I. 9-9 at 15; D.I. 9-11 at 35) In exchange for his truthful testimony, the State agreed to file a substantial assistance motion within 60 days of trial and to "provide specific services, including transportation, temporary housing during trial, relocation, including payment of six-months rent and a security deposit and 60 days of living expenses." (D.I. 9-11 at 35-36) Before Cooper took the witness stand, Petitioner filed a motion *in limine* raising the issue of the State's "ability to reference the provisions of the 'testify truthfully' language

19

of [the] Witness Protection Agreement." *Cruz-Webster*, 2017 WL 464536, at \*4; (D.I. 9-

19 at 111). The trial judge responded, "I don't think that's unfair for them to ask,

depending on what you ask." *Cruz-Webster*, 2017 WL 464536, at \*4; (D.I. 9-19 at 111)

The trial judge also stated, "Just be wary because if you open the door there's no

shutting it." *Cruz-Webster*, 2017 WL 464536, at \*4; (D.I. 9-19 at 111) Thereafter,

> [d]uring [Petitioner's] cross-examination of Cooper, defense counsel questioned Cooper about his motivation for cooperating with the prosecution. Defense counsel specifically referenced Cooper's written agreement with the State, marking it as Defense Exhibit A for Identification and showing it to Cooper. When he pressed Cooper about whether Cooper expected anything in return for his testimony other than what was spelled out in the agreement, Cooper responded, "That's it. I'm not doing this for their sake, I'm doing this because it's [a] good thing to do."
>
> Defense counsel then asked questions implying that was not true. Defense counsel asked if "the State's agreeing that they are going to file a motion for substantial assistance on our behalf after this to reduce your probation so you can leave the State?" Defense counsel's cross-examination of Cooper left the jury with the impression that Cooper's testimony was the result of the benefits he was receiving from the State.
>
> On redirect, the State asked Cooper questions that provided more detail about Cooper's Witness Protection Agreement. The prosecutor directed Cooper's attention to paragraph one of the agreement, asked him if he read it before he signed it, asked if he agreed to it, and then asked him about its provisions. Despite multiple opportunities to object to this line of questioning, defense counsel did not. Cooper read the provision of the agreement that required him "[t]o cooperate fully and truthfully with the investigation or prosecution of the State of Delaware versus [Petitioner] and to testify truthfully if called [as] a witness by any part[y] during a trial or in any part [sic] involving these matters." The prosecutor then asked Cooper to read other provisions of the agreement including that the State's obligation to file a substantial assistance

20

motion within 60 days of trial was not "dependent upon any particular result or outcome in the criminal matters."

*Cruz-Webster*, 2017 WL 464536, at *4-5.  Petitioner did not object to Cooper's testimony.

In Claim Two, Petitioner contends that the State engaged in misconduct when it vouched for Cooper's credibility by eliciting testimony on the "truthfulness" provisions of Cooper's Witness Protection Agreement with the State.  Petitioner raised this same argument on direct appeal.  After noting that Petitioner did not raise an objection to Cooper's redirect testimony during the trial, the Delaware Supreme Court cited Delaware Supreme Court Rule 8 and held that Claim Two "will not be reviewed on appeal because the record does not reflect any plain error."  *Cruz-Webster*, 2017 WL 464536, at *5.

By applying the procedural bar of Rule 8, the Delaware Supreme Court articulated a "plain statement" under *Harris v. Reed*, 489 U.S. 255, 263-4 (1984) that its decision rested on state law grounds.  In turn, Delaware Supreme Court Rule 8 is an independent and adequate state procedural rule precluding federal habeas review.  *See Campbell v. Burris,* 515 F.3d 172, 182 (3d Cir. 2008).  Thus, the Court cannot review the merits of Claim Two absent a showing of cause for the default, and prejudice resulting therefrom, or upon a showing that a miscarriage of justice will occur if the Claim is not reviewed.

Petitioner does not explicitly assert any cause for his failure to object to Cooper's testimony on redirect or cause for his failure to object to the State's manner of questioning Cooper on redirect.  Even if the Court liberally construes the ineffective

21

assistance of trial counsel allegation in Claim Four (*i.e.*, that trial counsel failed to properly object to the State's prosecutorial vouching for Cooper's credibility) as Petitioner's implicit attempt to establish cause, the attempt is unavailing. An attorney's error can constitute cause for a procedural default, but only if the petitioner first presented that ineffective assistance of counsel claim to the state courts as an independent claim and it was determined that the attorney's error amounted to constitutionally ineffective assistance. *See Murray*, 477 U.S. at 488-89. As explained later in the Opinion, trial counsel's failure to object to the State's questioning or Cooper's testimony does not amount to constitutionally ineffective assistance[5] and, therefore, cannot constitute cause.

In the absence of cause, the Court will not address the issue of prejudice. The miscarriage of justice exception to the procedural default doctrine also cannot be used to excuse Petitioner's default. Although Petitioner contends he can establish his actual innocence because he has a sworn affidavit from Gerald "Geez" Atkins refuting Cooper's testimony,[6] any such "affidavit" does not constitute "new reliable evidence" demonstrating his actual innocence within the meaning of *Schlup*. *See Taylor v. Illinois*, 484 U.S. 400, 414 (1988) ("It is … reasonable to presume that there is something

---

[5]*See infra* at Section III.D.1.

[6](D.I. 15 at 3-4). Petitioner has not provided an affidavit from Atkins. Postconviction counsel hired an investigator (Thomas Monohan) to conduct an interview with Atkins during Petitioner's Rule 61 proceeding, and the record contains a transcript of that interview. (D.I. 9-20 at 100-113) The Court presumes the interview transcript is the "Atkins affidavit" to which Petitioner refers. In that interview, Atkins stated that Cooper "told me that he lied about [Petitioner] telling him about a murder." (D.I. 9-20 at 109) Atkins also stated that he was in prison with Cooper and Petitioner at that time and Petitioner "never said that" – "it never occurred." (*Id.* at 110)   )

22

suspect about a defense witness who is not identified until after the 11th hour has passed"). Accordingly, the Court will deny Claim Two as procedurally barred from federal habeas review.

### C. Claim Three: Introduction of Cooper's Pretrial Video Statement Violated Petitioner's Due Process Right to a Fair Trial

In Claim Three, Petitioner argues that the Superior Court should have excluded Cooper's pretrial video statement to the police because it was cumulative and only served to bolster Cooper's direct testimony. The Delaware Supreme Court only reviewed the Claim for plain error under Rule 8 because Petitioner presented this argument for the first time on direct appeal. By applying Rule 8, the Delaware Supreme Court plainly stated that it was enforcing Petitioner's procedural default, which means that the Court cannot review the merits of Claim Three absent a showing of cause and prejudice, or a miscarriage of justice.

Petitioner has not explicitly alleged any cause for his default of Claim Three. To the extent Petitioner's argument in Claim Eight that trial counsel was ineffective for failing to object to the introduction of Cooper's recorded video statement should be treated as his implicit attempt to establish cause, the attempt is unsuccessful. As explained later in the Opinion, trial counsel's failure to object to the admission of Cooper's recorded statement does not amount to constitutionally ineffective assistance. *See* Section III.D.5. Therefore, trial counsel's actions cannot constitute cause for Petitioner's default.

Petitioner's failure to establish cause eliminates the need to address prejudice. In turn, Gerald Geez Atkins's affidavit does not trigger the miscarriage of justice

23

exception to the procedural default doctrine.  Thus, the Court will deny Claim Three as procedurally barred.

### D. Claims Four – Nine: Ineffective Assistance of Counsel

Claims Four through Nine assert that trial counsel provided ineffective assistance ("IATC") for various reasons.  Petitioner presented all six IATC Claims to the Superior Court in his Rule 61 motion. The Superior Court denied the Claims as meritless, and the Delaware Supreme Court affirmed that decision "on the basis of [the Superior Court's] Opinion dated August 31, 2020." *Cruz-Webster*, 2021 WL 1575180, at *1.  Given these circumstances, Petitioner's IATC Claims will only warrant relief if the Superior Court's[7] denial of those Claims was either contrary to, or an unreasonable application of, clearly established federal law.

Turning to the first prong of the § 2254(d)(1) inquiry in this proceeding, the Court notes that the Superior Court correctly cited and articulated the *Strickland* standard to be applied in Petitioner's case.  *See Cruz-Webster,* 2020 WL 5117967, at *2-3; *Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

---

[7]The Superior Court's denial of Petitioner's six IATC Claims is the last state court decision containing a reasoned analysis.  Consequently, the Court references the Superior Court's decision when analyzing Petitioner's IATC arguments under § 2254(d). *See Wilson v. Sellers*, 584 U.S. 122, 128 (2018) (reiterating that when a higher court affirms a lower court's judgment without an opinion or other explanation, federal habeas law employs a "look through" presumption and assumes that the later unexplained order upholding a lower court's reasoned judgment rests upon the same grounds as the lower court judgment).

The Court must also determine if the Superior Court reasonably applied the *Strickland* standard to the facts of Petitioner's case. *See Harrington*, 562 U.S. at 105-06. When performing this inquiry, the Court must review the Superior Court's denial of Petitioner's IAAC allegation through a "doubly deferential" lens. *Id.* "[T]he question is not whether counsel's actions were reasonable, [but rather], whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* When assessing prejudice under *Strickland*, the question is "whether it is reasonably likely the result would have been different" but for counsel's performance, and the "likelihood of a different result must be substantial, not just conceivable." *Id.* And finally, when viewing a state court's determination that a *Strickland* claim lacks merit through the lens of § 2254(d), federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101.

### 1. Claim Four: Counsel Failed to Object to Vouching

In Claim Four, Petitioner contends that trial counsel provided ineffective assistance by failing to object to Cooper's testimony about his Witness Protection Agreement ("WPA") or the State's related comments during closing argument. Petitioner asserts that the State's comments/questioning constituted improper vouching.

The Superior Court rejected the same argument in Petitioner's Rule 61 proceeding after concluding that trial counsel's decision not to object to the State's questioning on re-direct or comments during closing arguments did not constitute deficient performance or prejudice Petitioner, explaining:

> Trial Counsel knew it was critical to impeach Cooper's credibility, and to do so required questioning Cooper about the

25

> WPA. As Trial Counsel's Affidavits and the record make clear, Trial Counsel was well aware that by questioning Cooper on the WPA he would "open the door," thereby allowing the prosecutor to question Cooper on other provisions of the WPA, including Defendant's agreement to "testify truthfully." Trial Counsel weighed the risks and benefits and made an informed decision to run the risk in order to impeach Cooper's credibility, and, as the Supreme Court noted on direct appeal, he obtained the benefit he sought: "Trial Counsel left the jury with the impression that Cooper's testimony was the result of benefits he was receiving from the State."
>
> Contrary to [Petitioner's] argument, the prosecutor did not suggest or convey that he had any additional personal knowledge or belief that Cooper was telling the truth, and in his closing, he merely argued that the existence of the WPA was likely to incentivize Cooper not to lie. This was not inappropriate nor did it constitute vouching. [Petitioner] fails to establish that Trial Counsel's performance fell below an objective standard of reasonableness and that he suffered prejudice as a result.

*Cruz-Webster*, 2020 WL 5117967, at *4 (cleaned up).

"Vouching constitutes an assurance by the prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury." *United States v. Walker,* 155 F.3d 180, 184 (3d Cir. 1998). A prosecutor's statements constitute vouching when (1) he or she assures the jury that the testimony of a Government witness is credible; and (2) the assurance is based on either the prosecutor's personal knowledge or other information not contained in the record. *See Lawn v. United States*, 355 U.S. 339, 359 n.15 (1958); *see also Walker*, 155 F.3d at 187.

26

In Petitioner's case, the Superior Court reasonably determined that the State did neither.  Following trial counsel's cross examination, and consistent with trial counsel's expectations, the State elicited from Cooper basic information about the written WPA he entered into with the State: that, in return for witness protection services, Cooper agreed to "cooperate fully and truthfully with the investigation or prosecution of the State of Delaware versus [Petitioner] and to testify truthfully if called [as] a witness by any part[y] during a trial." (D.I. 9-19 at 125-127)  Then, in its summation and rebuttal summation to the jury, the State referred to the terms of the WPA, and addressed Cooper's bias and motivation by arguing logical inferences from the evidence.  (D.I. 9-20 at 30, 34-35) When viewed in this context, the State's questioning, comments during closing, and reference to the WPA properly informed the jury that Cooper was incentivized not to lie. *See, e.g., United States v. Lore*, 430 F.3d 190, 212 (3d Cir. 2005) (rejecting claim that argument constituted improper vouching where "throughout the comments . . . the prosecutor referenced the corroborating evidence of record.").  Thus, trial counsel did not provide ineffective assistance by failing to raise a meritless "vouching" objection. *See Werts,* 228 F.3d at 202 ("counsel cannot be deemed ineffective for failing to raise a meritless claim"); *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999).

Accordingly, the Court will deny Claim Four for failing to satisfy § 2254(d).

### 2. Claim Five: Counsel Failed to Request Mistrial After State Elicited Officer Barnes's Opinion Testimony

Next, Petitioner argues that trial counsel provided ineffective assistance by requesting a curative instruction instead of a mistrial after Officer Barnes testified that he did not believe Lewis did not know who shot him.  The Superior Court rejected

27

Petitioner's argument after concluding that he failed to satisfy either prong of the *Strickland* standard.

On direct appeal, the Delaware Supreme Court held that the State did not engage in misconduct when questioning Officer Barnes about Lewis's statement. *See supra* at Section III.A.; *Cruz-Webster*, 2017 WL 464536, at *4. In his Rule 61 affidavit, trial counsel avers that, while the "best practice would have been to move for a mistrial," the trial court most likely would not have granted a mistrial "because there was no prosecutorial misconduct." (D.I. 9-21 at 126-127) Given the absence of prosecutorial misconduct, the Superior Court reasonably applied *Strickland* in holding that trial counsel's failure to request a mistrial instead of a curative instruction did not constitute deficient performance. In turn, given the Delaware Supreme Court's determination that the Superior Court's immediate curative instruction cured any potential prejudice to Petitioner, the Superior Court also reasonably applied clearly established federal law in finding Petitioner failed to satisfy the prejudice prong of *Strickland*.

Accordingly, the Court will deny Claim Five for failing to satisfy § 2254(d).

### 3. Claim Six: Counsel Failed to Explicitly Recite "D.R.E. 901—lack of authentication"

In Claim Six, Petitioner alleges that trial counsel rendered ineffective assistance by failing to state "D.R.E. 901—lack of authentication" when objecting to the admission of store video and register receipts. Petitioner believes the trial court would have excluded the evidence if trial counsel had uttered this exact phrase.

The Superior Court rejected Petitioner's underlying argument as one of "form over substance," explaining:

28

> While Trial Counsel did not cite D.R.E. 901 or explicitly use
> the term "authentication," Trial Counsel raised an objection to
> the evidence at issue, articulated the basis for it, and the Court
> understood the objection.    The Court overruled Trial
> Counsel's objection, ruling that the date and time discrepancy
> went "to the weight not the admissibility."    Trial Counsel's
> objection was reasonable, the Court understood the basis for
> it when it overruled it, and had Trial Counsel added the word
> "authentication" or cited D.R.E. 901, the ruling would have
> been the same.    Trial Counsel knew that.  Therefore,
> [Petitioner's] third IAC claim fails.

*Cruz-Webster*, 2020 WL 5117967, at *5.   Since the trial court would have issued the

same ruling even if trial counsel had explicitly stated "D.R.E. 901 – lack of

authentication," the Court concludes that the Superior Court reasonably applied

*Strickland* in rejecting the instant Claim as meritless.   Thus, the Court will deny Claim

Six.

### 4.  Claim Seven: Counsel Failed to Request the Removal of a Juror for Misconduct

During a witness's testimony on the first day of trial, the State advised the Court

that Juror Number 7 "might be dozing off."  *Cruz-Webster*, 2020 WL 5117967, at *6-7.

On the last two days of trial, Juror Number 7 arrived late to the proceedings. *Cruz-*

*Webster*, 2020 WL 5117967, at *6.

In Claim Seven, Petitioner asserts that trial counsel should have sought the

removal of Juror Number 7 for displaying consistent patterns of inattentiveness

throughout the trial.  In his Rule 61 affidavit, trial counsel avers that he did not seek the

removal of Juror Number 7 because: (1) he did not observe Juror 7 sleeping; (2) if Juror

7 did nod off, it did not occur during an essential portion of the trial; (3) the prosecutor

who observed the behavior did not feel compelled to move to exclude the Juror; (4) he

29

did not view Juror Number 7's tardiness the last two days of trial as misconduct, because she explained it was due to work matters and she stated she was able to focus on closing arguments  (D.I. 9-21 at 128-130)

The Superior Court concluded that trial counsel's failure to seek the removal of Juror Number 7 did not satisfy either prong of the *Strickland* standard because: (1) "there is no evidence to support that [Juror Number 7] actually fell asleep or was otherwise inattentive, and there was no evidence to support prejudice to [Petitioner]";(2) the trial judge conducted a colloquy with Juror Number 7 concerning her tardiness and decided to allow the Juror to continue serving on the jury; and (3) trial counsel's professional judgment that Juror Number 7's tardiness did not amount to misconduct comports with the trial judge's decision to let her stay on the jury. *See Cruz-Webster*, 2020 WL 5117967, at *6- 7.  Having thoroughly reviewed the record, the Court concludes that the Superior Court reasonably applied *Strickland* in denying this Claim.  The lack of evidence that Juror Number 7 actually fell asleep or was otherwise inattentive combined with trial counsel's professional opinion that he felt Juror Number 7 was attentive and that her tardiness did not constitute a reason for removal demonstrates that trial counsel's failure to seek Juror Seven's removal did not fall below an objective standard of reasonableness.  In addition, Petitioner has not demonstrated a reasonable probability that the removal of Juror Seven would have changed the outcome of his trial.  Accordingly, the Court will deny Claim Seven.

30

### 5. Claim Eight: Counsel Failed to Object to Admission of Cooper's Prerecorded Statement

In Claim Eight, Petitioner asserts that trial counsel should have objected to the admission of Cooper's videotaped 11 Del. C. § 3507 testimony ("3507 Statement") on the basis that it bolstered Cooper's testimony and vouched for his credibility.[8] The Superior Court rejected this Claim, stating:

> [A]ssuming, arguendo, Trial Counsel erred by not objecting to the 3507 Statement during Cooper's direct examination, [Petitioner's] claim that Trial Counsel's error improperly bolstered Cooper's testimony and vouched for his credibility is not supportable given the record in this case. This is so because there was ample other evidence corroborating Cooper's testimony, including Shaw's testimony identifying [Petitioner] as the man arguing with her nephew, Lewis, right before Lewis was shot, and Luevano's testimony that the man arguing with Lewis is the one who shot Lewis.

---

[8] Section 3507 provides:

> (a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

> (b) The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party.

> (c) This section shall not be construed to affect the rules concerning the admission of statements of defendants or of those who are codefendants in the same trial. This section shall also not apply to the statements of those whom to cross-examine would be to subject to possible self-incrimination.

*Cruz-Webster*, 2020 WL 5117967, at *8. More specifically, the Superior Court held that Petitioner could not establish prejudice under *Strickland* because the admission of the 3507 Statement was not improper and there was ample other evidence supporting Petitioner's guilt *Id.* at *9.

On habeas review, the Court must defer to the Delaware court's application and interpretation of Delaware state law that the 3507 Statement was properly admitted. It is well-settled that an attorney does not provide ineffective assistance by failing to raise meritless objections. Accordingly, the Court concludes that the Superior Court reasonably applied *Strickland* in holding that Petitioner did not establish prejudice. Therefore, the Court will deny Claim Eight.

### 6. Claim Nine: Counsel Failed to Investigate Gerald Atkins as Potential Witness

During Petitioner's trial, Cooper testified that he and Petitioner had a conversation during which Petitioner during which Petitioner admitted to shooting and killing Lewis. In Claim Nine, Petitioner argues that trial counsel provided ineffective assistance by failing to investigate Gerald Atkins because he could have refuted Cooper's testimony. The following summary from the Superior Court's Rule 61 decision provides background information relevant to Claim Nine:

> [Petitioner] initially represented to the [Superior] Court that he informed Trial Counsel before trial that: (1) Atkins witnessed Defendant's conversation with Cooper; [and] (2) . . .Atkins could dispute Cooper's testimony. Trial Counsel squarely refuted those representations in his First Affidavit:
>
>> I do not recall that [Petitioner], prior to trial, informed me of the existence of a witness to the

32

> conversation that occurred between him and Donald Cooper and who could dispute Cooper's account of events. [Petitioner] could not have made that request prior to trial because the Court did not unseal that information until after trial began. If the alleged presence of Atkins was contained in the information provided by the State, it would not have been disclosed to Defendant until January 6, two days after the trial began. If it was first disclosed during Cooper's trial testimony, then [Petitioner[ and I would have learned about it at that time.

After receiving Trial Counsel's First Affidavit, [Petitioner] admitted:

> Trial Counsel is correct; [Defendant] concedes that he was initially mistaken as to when he asked [Trial Counsel] to interview Gerald Atkins.

> I, [Petitioner], attest that during trial on January 6, 2016, I learned for the first time that the State's witness, Mr. Donald Cooper, alleged I had a jailhouse conversation with him in which I purportedly admitted to shooting and killing Mr. Lewis. It was during Mr. Cooper's testimony on direct examination that I also first learned of Atkins's involvement in my case.

*Cruz-Webster*, 2020 WL 5117967, at \*9 (cleaned up).  Nevertheless, Petitioner argued

that trial counsel "should have known that Atkins could have potentially refuted Cooper's

testimony." *Id.*

The Superior Court denied Claim Nine after concluding Petitioner failed to satisfy

both prongs of the *Strickland* standard. The Superior Court determined that trial

counsel's decision not to interview Atkins after trial was "not objectively unreasonable"

33

because: (1) trial counsel was "keenly aware of the plethora of evidence establishing [Petitioner's] guilt"; and (2) "it was unclear whether Atkins could even refute Cooper's testimony." *Cruz-Webster*, 2020 WL 5118967, at *10. The Superior Court also found that Petitioner could not establish prejudice "because he fails to overcome all the other evidence corroborating Cooper's testimony." *Id.*

In this proceeding, Petitioner does not articulate the testimony he believes Atkins would have provided to refute Cooper's testimony. To the extent the statement Atkins provided to Petitioner's investigator during his Rule 61 proceeding is indicative of Atkins's potential testimony, the Court concludes that Superior Court reasonably determined the facts in concluding that the vague and convoluted assertions in Atkins's statement were unlikely to refute Cooper's testimony. (*See* D.I. 9-20 at 100-113) Viewing Atkins's statement in conjunction with the other substantial evidence of Petitioner's guilt, Petitioner cannot establish a reasonable probability that the outcome of his trial would have been different but for trial counsel's failure to interview Atkins. Given Petitioner's failure to demonstrate prejudice, the Superior Court reasonably applied *Strickland* in denying Claim Nine.

Accordingly, the Court will deny Claim Nine for failing to satisfy § 2254(d).

### E. Claim Ten: Cumulative Error

In Claim Ten, Petitioner alleges that the cumulative effect of each alleged error is sufficiently prejudicial to warrant relief. Petitioner presented the same "cumulative error" argument in his Rule 61 motion to the Superior Court, which denied the argument as meritless. Therefore, Claim Ten will only warrant habeas relief if the Delaware Supreme

Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

The United States Supreme Court has not recognized the concept of cumulative error. *See Bush v. Carpenter*, 926 F.3d 644, 686 n.16 (10th Cir. 2019). Since there is no clearly established Federal law with respect to a cumulative error argument, it would appear that the Court's § 2254(d) analysis is over and Petitioner is not entitled to habeas relief for Claim Ten.

Nevertheless, the Third Circuit has recognized the cumulative error doctrine on habeas review, holding that "a cumulative error argument constitutes a stand-alone constitutional claim subject to exhaustion and procedural default." *Collins v. Sec'y of Pa. Dep't of Corr.* 742 F.3d 528, 542 (3d Cir. 2014). Pursuant to the cumulative error doctrine,

> [i]ndividual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice.

*Fahy,* 516 F.3d at 205. Given the Third Circuit's recognition of the cumulative error doctrine in habeas proceedings, the Court will exercise prudence and review Claim Ten.

Here, the Superior Court reviewed and rejected each alleged underlying error on its merits, and also rejected Petitioner's cumulative error argument because he failed to meet his burden of demonstrating that the combined errors are "so clearly prejudicial to

35

substantial rights as to jeopardize the fairness and integrity of the trial process." *Cruz-Webster*, 2020 WL 5117967, at*10.   As previously discussed, this Court has concluded that Claims One and Four through Nine lack merit, and that declining to review the merits of procedurally barred Claims Two and Three will not prejudice Petitioner. Therefore, the Court will deny Claim Ten as meritless.

### F. Claim Eleven: Actual Innocence

In his original Petition, Petitioner asserts actual innocence as both a freestanding claim and a gateway claim to circumvent any procedural bars.  (D.I. 1-1)  He contends that Lewis's "dying declaration and [Atkins's] affidavit . . . is new evidence of actual innocence for the sake of . . . *Schlup*."  (D.I. 1-1 at 6)

In "certain exceptional cases involving a compelling claim of actual innocence," a prisoner may assert actual innocence as a gateway for obtaining habeas review of defaulted claims.  *House v. Bell*, 547 U.S. 518, 521, 536-37 (2006).  Yet, whether a freestanding claim of actual innocence is cognizable on federal habeas review remains an open question in Supreme Court jurisprudence.  *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013); *Reeves v. Fayette SCI*, 897 F.3d 154, 160 n.4 (3d Cir. 2018).  Even for gateway claims, "[a]ctual innocence means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623.  Assuming, *arguendo*, that an assertion of actual innocence could constitute a freestanding claim, a petitioner's burden on any such claim "would necessarily be extraordinarily high" and "more demanding" than that applied to gateway actual-innocence claims.  *Herrera v. Collins*, 506 U.S. 390, 416 (1993); *see also Reeves*, 897 F.3d at 160 n.4 (describing hypothetical freestanding

36

actual-innocence standard as "more demanding" than that applied to gateway actual-innocence claims).  To put the burden for establishing a freestanding claim of actual innocence in perspective, a gateway actual innocence claim that is asserted in an effort to overcome the statute of limitations bar for habeas cases will only prevail if it is based on "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence [ ] that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Here, Petitioner has not presented any facts to establish his actual innocence, and Atkins's affidavit does not constitute colorable evidence of his actual innocence. Therefore, Petitioner's instant assertion of innocence does not satisfy the *Schlup* standard.  Accordingly, the Court will deny Claim Eleven for failing to assert an issue cognizable on federal habeas review or, alternatively, as meritless.

## IV.    CERTIFICATE OF APPEALABILITY

The Court must decide whether to issue a certificate of appealability.  *See* 3d Cir. L.A.R. 22.2 (2011).  A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Additionally, if a federal court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would find debatable: (1) whether the petition states a valid claim of the denial of

37

a constitutional right; and (2) whether the court was correct in its procedural ruling. *See Slack,* 529 U.S. at 484.

The Court has concluded that the instant Petition fails to warrant federal habeas relief. Reasonable jurists would not find this conclusion to be debatable. Accordingly, the Court will not issue a certificate of appealability.

## V.    CONCLUSION

For the reasons discussed above, the Court will deny the instant Petition without an evidentiary hearing.

The Court will issue an Order consistent with this Memorandum Opinion.

38